**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8                     IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   BARRIE TAYLOR,                          No. C05-04959 MJJ

12              Petitioner,                   **ORDER DENYING PETITION FOR**
                                              **WRIT OF HABEAS CORPUS IN THE**
13        v.                                  **MATTER OF AN INTERNATIONAL**
                                              **EXTRADITION**
14   FEDERICO L. ROCHA, U.S. Marshal

15              Respondent.
     _____/
16

17                              **INTRODUCTION**

18        Before the Court is Barrie Taylor's ("Taylor" or "Petitioner") Petition for Writ of Habeas

19   Corpus in the Matter of an International Extradition[1] ("Petition") filed pursuant to 28 U.S.C. § §

20   2241 and 2242.  Petitioner alleges she was deprived of due process and equal protection during her

21   extradition hearing held on September 27, 2005 before Magistrate Judge Elizabeth Laporte in United

22   States District Court, Northern District of California.  On October 28, 2005, Magistrate Judge

23   Laporte issued a Certification of Extraditability and Order of Commitment ("Extradition Order").

24   For the following reasons, the Court **DENIES** the petition for writ of habeas corpus.

25                              **BACKGROUND**

26   A.       **The Commitment Offense**

27        On October 2, 1993, French police arrested Petitioner at her residence in Versailles, France.

28   (*See* United States' Submission of Document Packet I in Support of Extradition ("Packet I"),

_____
[1] Docket No. 1.

1   Extradition Application ("Extradition Application") at 1.)  At the time of her arrest, Petitioner shared

2   a residence with Philippe Pavageau ("Mr. Pavageau").  (*See Id.*)  Petitioner, an American citizen

3   living in France since 1990, was a suspect in the murder of Roxanne Pavageau ("Ms. Pavageau"),

4   the estranged wife of Mr. Pavageau.  (*See Id.*)  Three days earlier, the police found Ms. Pavageau's

5   body in the staircase leading from the cellar to the backyard of the home shared by Petitioner and

6   Mr. Pavageau.  (*See* Id.)  Following her arrest, the police held Petitioner in custody during the entire

7   "instruction stage" or preliminary investigation stage of the French criminal process, which lasted

8   more than fifty-four months.  (*See Id.* at 20.)

9          After her attorneys raised concerns about her mental and physical health, the French

10   authorities released Petitioner from pretrial detention on April 22, 1998 under court supervision.

11   (*See Id.* at 7.)   As conditions of her release, Petitioner was ordered to reside in Paris, to report twice

12   a week to a local precinct in Paris, and was instructed not to leave France without court

13   authorization.  (*See* Packet I, Order No. 19/99 from The Court of Appeal of Versailles, First

14   Chamber of Accusation dated March 5, 1999.)   As of December 10, 1998, Petitioner was in

15   violation of the terms of her release when she ceased reporting to a Parisian police station.  (*See*

16   Extradition Application at 1.)  In January 1999, the French police reported Petitioner's violation.

17   (*See* Decision of European Court of Human Rights at 12.)

18          In a letter dated February 10, 1999, Petitioner informed the French court that she had

19   returned to the United States to receive medical attention and obtain evidence necessary for her

20   defense and intended to return to France for the trial.   (*See* Packet I, Letter from Barrie Taylor to

21   President Pomentan, Monsieur Pons, and Monsieur Riquin, February 10, 1999.)  Later, Petitioner

22   indicated she would not return to France for her trial.  (*See* Packet I*,* Letter from Barrie Petitioner to

23   Mr. President of the Cour d'Assises, date unknown, at 1-2).  On March 5, 1999, the French police

24   issued an order for Petitioner's arrest.  (*See* Extradition Application at 12.)  On June 23, 2000, the

25   Yvelines Court of Assizes in France found Petitioner guilty *in absentia* of murder and sentenced her

26   to thirty years in prison.  (*See Id.* at 6.)

27   **B.     Prehearing and Hearing Matters**

28          On November 20, 2003, Petitioner was arrested pursuant to a warrant at the request of France

in accordance with the Extradition Treaty Between the United States of America and France, signed in Paris on April 23, 1996 ("Treaty").  (*See* United States' Submission of Documents Packet II in Support of Extradition ("Packet II"), Treaty.)  A formal request for Petitioner's surrender and supporting documents from the French authorities were filed with the court on November 25, 2003.  (*See* Packet I and Packet II.)

In November 2003, the court appointed counsel for Petitioner.  In early 2004, however, Petitioner reported problems with appointed counsel including the fact that her counsel did not speak fluent French.  (*See* Extradition Order at 2.)  The court then appointed her counsel who was fluent in French.  (*See* Id.)  On July 13, 2004, the court denied Petitioner's release at a bail hearing and set her extradition hearing for October 5, 2004.  (*See Id.*)  On July 27, 2004, France filed a Memorandum of Points and Authorities in support of its extradition request.  (*See* Id.)

On September 10, 2004, the court released Petitioner's second counsel from representing her after Petitioner expressed dissatisfaction with her French-speaking counsel and asked to represent herself *pro se*.  (*See* Id.)  On November 5, 2004, the court appointed a third attorney.  (*See* Id.)  After Petitioner's third counsel raised questions of Petitioner's competency, the court permitted counsel to withdraw on August 18, 2005, ordered Petitioner to proceed *pro se*, and set the extradition hearing for September 27, 2005.  (*See* Id.)  In a letter dated March 31, 2005, Petitioner advised the magistrate judge that although she believed she had medical and psychological issues she was competent and understood her legal situation.  (*See* Packet I, Letter from Barrie Taylor to Judge Laporte, dated March 31, 2005, at 3.)   The Court concluded that Petitioner had been lucid, able to communicate with the Court at every hearing, expressed that she was competent, and was previously able to represent herself.  (*See* Order Denying Motion for Competency Hearing.)  The magistrate judge further concluded that given the limited function of extradition proceedings, Petitioner's competency to assist counsel was not relevant to extradition and that Petitioner could raise the issue of assistance of counsel or proceeding *pro se* with the French tribunal if Petitioner was indeed extradited to France.  (*See Id.*)

On September 6, 2005, Petitioner filed two oppositions to France's extradition request, one of which was drafted with assistance from attorney John Philipsborn.  (*See* Extradition Order at 2.)

3

1    The court granted Petitioner's request for Mr. Philipsborn to appear specially for her at the hearing.

2    (*See Id.*)  On September 13, 2005, France filed a reply to Petitioner's oppositions. (*See Id.*)  On

3    September 21 and 23, 2005, Petitioner submitted additional exhibits in support of her opposition.

4    (*See* Id.)

5    **PROCEDURAL BACKGROUND**

6       Petitioner appeared before Magistrate Judge Laporte in the United States District Court,

7    Northern District of California on September 27, 2005 for her extradition hearing.  (*See* Extradition

8    Order.)  On October 28, 2005, Magistrate Judge Laporte issued an Extradition Order.  (*See Id.*)

9    Petitioner filed a petition for writ of habeas corpus and a motion for stay of extradition pending

10   resolution of habeas petition under 28 U.S.C. § 2241 and 28 U.S.C. § 2201 on December 1, 2005.

11   On March 8, 2006 Magistrate Judge Laporte issued on Order to Show Cause consolidating

12   Petitioner's claims.  (*See* Docket No. 17.)   On June 9, 2006, the case was reassigned to this Court.

13   (*See* Docket No. 49.)

14   **LEGAL STANDARDS**

15       Extradition proceedings are not criminal proceedings since "no guilt or innocence is

16   determined in them.  Nor are extradition proceedings civil as the term is used in our rules, so that

17   they are not governed by the Federal Rules of Civil Procedure."  *Matter of Requested Extradition of*

18   *Kirby*, 106 F.3d 855, 867 (9th Cir. 1996) citing *Merino v. United States Marshal*, 326 F.2d 5, 12-13

19   (9th Cir.1963), *cert. denied*, 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046 (1964).  Rather,

20   extradition proceedings are *sui generis*.  *Id. citing Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.),

21   cert. denied, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978).  They are "essentially

22   administrative in character."  *Id. citing* Fed. R. Evid. 1101(d)(3), U.S.C.A. Title 28, Notes of

23   Advisory Committee on [1972] Proposed Rules, Note to Subdivision (d) (West 1984).

24       "The decision to certify a person as extraditable is not subject to direct appeal but may be

25   challenged collaterally through habeas corpus review."  *Prasoprat v. Benov*, 421 F.3d 1009, 1013

26   (9th Cir. 2005).  The Ninth Circuit has held that a district court's habeas corpus review of a

27   certification of extraditablility is limited to the following four inquiries:

28

> (1) whether the extradition court had jurisdiction to conduct the
> proceeding and jurisdiction over the individual sought; (2) whether the

*United States District Court*
For the Northern District of California

extradition treaty was in force and the crime fell within the treaty's
terms; (3) whether there was probable cause that the individual
committed the crime; and (4) whether the crime fell within the
political offense exception.

*Id.  See also Mainero v. Gregg,* 164 F.3d 1199, 1205 (9th Cir. 1999); *Fernandez v. Phillips*, 268
U.S. 311, 312 (1925) (stating that "habeas corpus is available only to inquire whether the magistrate
had jurisdiction, whether the offense charged is within the treaty and … whether there was any
evidence warranting the finding that there was a reasonable ground to believe the accused guilty.")

## LEGAL CLAIMS

### I.     Petitioner's Claims

Magistrate Judge Laporte issued an Order consolidating Petitioner's legal claims and ordered
Respondent to address the following issues: (1) whether Petitioner's Fifth and Sixth Amendment
right to assistance of counsel were denied when she was forced to proceed *pro se* at the extradition
hearing; (2) whether Petitioner's Fifth and Sixth Amendment rights were denied when the Court
failed to receive and/or review all of her motions, letters, pleadings, and other submitted documents;
(3) whether Petitioner was erroneously certified for extradition because medical records from France
indicate that her mental health had deteriorated; (4) whether Petitioner's rights were denied when
she was ordered to represent herself at the extradition without first undergoing a court-ordered
psychiatric or psychological evaluation; (5) whether Petitioner was denied the right to call
psychiatric expert witnesses at the extradition hearing; (6) whether Petitioner was erroneously found
extraditable because France provided documentation that was incomplete and insufficient to sustain
a finding of probable cause; (7) whether Petitioner was erroneously found extraditable because the
magistrate judge erred by deferring decision-making authority on the humanitarian exception to the
Executive Branch; and (8) whether Petitioner was erroneously found extraditable because, absent
taking further evidence under Article 10 and 15 of the Treaty, the extradition proceeding was
statutorily and constitutionally incomplete.  (*See* Order to Show Cause, Docket No. 17.)

After weighing all of the issues raised by Petitioner, the Court considers them to the extent
that any bear on the four-part inquiry prescribed by the Ninth Circuit for collateral review of an
extradition hearing, as stated in *Prasoprat v. Benov*, 421 F.3d at 1013.

5

**United States District Court**
For the Northern District of California

**II.     Sufficiency of the Extradition Order**

As stated *supra*, a district court conducting collateral review of an extradition hearing may only inquire into: (1) whether the extradition court had jurisdiction to conduct the proceeding and jurisdiction over the individual sought; (2) whether the extradition treaty was in force and the crime fell within the treaty's terms; (3) whether there was probable cause that the individual committed the crime; and (4) whether the crime fell within the political offense exception. *Prasoprat v. Benov*, 421 F.3d at 1013. The Court now turns to this four-part inquiry.

**A.     Jurisdiction**

The first inquiry is whether the court that conducted the extradition hearing had jurisdiction both to conduct the proceeding and over the individual sought. Extradition is the means by which a requesting country obtains a limited form of personal jurisdiction over a defendant. *United States v. Anderson*, No. 05-30211, slip op. 20011, 20021-22 n.3 (9th Cir. Dec. 28, 2006). Under 18 U.S.C. § 3184, "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States" has personal jurisdiction over "any person found within his jurisdiction." Petitioner was found within the Northern District of California at the time of her arrest and identified herself as "Barrie Taylor" at her initial appearance and Petitioner has not disputed she is the person sought by the French government. (*See* Extradition Application.)

Whenever there is a treaty in effect between the United States and any foreign government, an extradition proceeding may be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States." 18 U.S.C. § 3184; *Ward v. Rutherford*, 921 F.2d 286 (D.C. Cir. 1990) (rejecting constitutional challenge to magistrate's authority to hear extradition cases). In the Northern District of California, magistrate judges are authorized to conduct extradition proceedings assigned to them by a district court judge pursuant to Criminal Local Rule 7-1(b)(13). Here, District Court Judge Susan Illston assigned the case to Magistrate Judge Laporte to preside over the matter and Magistrate Judge Laporte conducted an extradition hearing on August 27, 2005 and certified Petitioner's extradition on October 28, 2005. (*See* CR-03-0286 MISC SI EDL, Docket No. 30.) The Court finds the extradition court had proper jurisdiction over both the proceeding and Petitioner.

**United States District Court**
For the Northern District of California

**B.       The Extradition Treaty**

The second inquiry is whether the Treaty was in force and whether the crime in question fell within the treaty's terms.  The right of a foreign sovereign to demand and obtain extradition of an accused criminal is created by treaty.  *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir. 1986).  In support, the government submitted a declaration from Kenneth Propp, an Attorney Adviser with the Department of State, attesting that a Treaty exists and is in full force and effect between the United States and France.  (*See* Propp Decl. at ¶¶ 2-3.)  The Treaty between the United States and France provides that the states "agree to extradite to each other, … persons whom the competent authorities in the Requesting State have charged with or found guilty of an extraditable offense."  (*See* Treaty, Art. 1.)  Accordingly, the Court finds a Treaty of Extradition is in full force and effect between the United States and France and that the Treaty applies to the instant case.

As to whether the crime falls within the Treaty's terms, Article Two of the Treaty states:

1.       Acts shall be extraditable if they are punished under the laws in both States by deprivation of liberty for a maximum of at least one year or by a more severe penalty.
…
3.       For the purpose of this Article, an offense shall be an extraditable offense: (a) whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology; or (b) whether or not the offense is one for which United States federal law requires proof or an element of proof, such as passage from one state to another, the use of the mails, wire and other facilities of interstate or foreign commerce, or the effects upon such commerce, since such an element is required for the sole purpose of establishing jurisdiction of United States Federal Courts.

(*See* Treaty, Art. 2.)

The definition of an extraditable offense under the Treaty incorporates the principle of dual criminality.  Under dual criminality, a court should not certify a fugitive for extradition except for conduct that is criminal in both jurisdictions.  *Yin-Choy v. Robinson*, 858 F.2d 1400, 1404 (9th Cir. 1988).  To satisfy the requirement, the specific nomenclature used to describe the crime in the two countries need not be the same, nor does the scope of liability for the crime need to be the same.  *Id.* Instead, dual criminality exists if the "essential character of the acts criminalized by the law of each country are the same and if the laws are substantially analogous."  *Id.* (citations omitted).  On June 23, 2003, France charged Petitioner with murder.  (*See* June 23, 2000 Abstract of Judgment; July 1, 1998 Judgment; Extradition Application at III.)  Murder is a crime in both the United States and France that is punishable by a deprivation of liberty for more than one year.  French Penal Code Art.

1   221-1 (punishment for murder is thirty years); Cal. Penal Code § 190 (punishment for first degree

2   murder is death, life in prison or twenty-five years to life; punishment for second degree murder is

3   fifteen years to life and more if special circumstances are involved.)  Since France charged

4   Petitioner with committing murder, the relevant conduct satisfies the requirement of dual criminality

5   and the Treaty applies to the criminal offense.

6           **C.      Offense Under the Treaty**

7           The third inquiry is whether there was probable cause that the individual presented

8   committed the crime.  In an extradition hearing, a probable cause inquiry focuses on whether there is

9   any evidence to warrant a finding that there was a reasonable ground to believe the accused guilty,

10  not whether there is sufficient evidence to support a conviction.  *Yin-Choy*, 858 F.2d at 1407

11  (citations omitted).  The standard is analogous to the standard for determining whether to hold a

12  defendant to answer for a charged offense.  *In the Matter of Extradition of Lin*, 915 F. Supp. 206,

13  210 (D. Guam 1995).

14          As stated in Magistrate Judge Laporte's Extradition Order, the evidence submitted in support

15  of extradition is contained in the Extradition Application signed by Deputy General Prosecutor

16  Marie Anne Chapelle.  That evidence is restated here.  (*See* Packets I and II.)

17          On September 28, 1993, and again on September 29, 1993, Ms. Pavageau's son notified the

18  police that his mother was missing. (*See* Extradition Application at 1.)  On September 29, 1993, the

19  police went to Petitioner's home and on September 30, 1993, the police inspected the home and

20  found Ms. Pavageau's body on the staircase leading from the garden to the cellar.  (*See Id.*)  The

21  police also found a recently dug hole in the garden and noted that Petitioner had earth on her hands

22  at the time of the inspection. (*See Id.*)  Ms. Pavageau's feet and hands were bound, her head and

23  torso were covered by a bag surrounded at chest level by electric wire, and she had been violently

24  hit about twenty times in the head, causing skull fractures and brain lesions.  (*See Id.*)

25          Further investigation revealed that the guard rail of the staircase was covered by a quilt that

26  shielded the staircase from the neighbor's sight. (*See Id.*)  There were marks that appeared to be

27  blood in the main entrance, the sitting room and the dining room. (*See Id.*)  The police found gloves

28  in the hall of the first floor that had marks of a brownish color. (*See Id.*)

*United States District Court*
For the Northern District of California

8

United States District Court
For the Northern District of California

1    Petitioner's attitude during the police investigation was "generally disconcerting" to the

2    police. (*See Id.* at 3.)  Petitioner refused to answer questions, lied about her knowledge of French,

3    pretended to feel faint and put her fingers in her ears when asked questions.  (*See Id.*)  During the

4    police investigation, however, Petitioner did claim she acted in self-defense. (*See Id.*)  Petitioner

5    stated that Ms. Pavageau came to Petitioner's home looking for Mr. Pavageau and threatened to kill

6    him. (*See Id.*)  Ms. Pavageau also threatened Petitioner and hit Petitioner with an object. (*See Id.*)

7    Petitioner then retrieved a tear gas grenade from her bag to hit Ms. Pavageau. (*See Id.*)  Petitioner

8    claimed that these events took place in her home's corridor and that when she returned to the house,

9    that is when she found Ms. Pavageau's body. (*See Id.*)  Petitioner admitted digging the hole in the

10   garden, but would not specify why she did so. (*See Id.*)  Petitioner did not remember transporting

11   Ms. Pavageau's body and did not know who could have bound her hands and feet. (*See Id.*)

12   On October 2, 1993, Petitioner was arrested and the public prosecutor of Versailles opened a

13   preliminary investigation against her. (*See Id.* at 5.)  Petitioner told the examining magistrate that

14   she had saw Ms. Pavageau at a hair salon and waited for her to exit the shop. (*See Id.* at 3)

15   Petitioner said that the two women spoke about Ms. Pavageau's alleged burglary of the home shared

16   by Petitioner and Mr. Pavageau during which Ms. Pavageau allegedly stole some silverware. (*See

17   Id.*)  Petitioner said that Ms. Pavageau was irritated at the exchange outside the shop. (*See Id.*)

18   Petitioner returned home to find the front door open and the insurance file relating to the burglary

19   moved. (*See Id.*)  Petitioner claims she saw Ms. Pavageau coming up from the cellar holding a

20   hammer in her hand and shouting that she intended to kill Mr. Pavageau. (*See Id.*)  Ms. Pavageau

21   then threw herself against Petitioner and held the hammer object over Petitioner's head. (*See Id.*)

22   Petitioner managed to seize the hammer and struck Ms. Pavageau with it. (*See Id.*)  Petitioner said,

23   "I suppose to have stricken her, but I don't remember to have hit her, I obviously did it." (*See Id.*)

24   After, Petitioner left to find shelter in her car and later went to ask a male friend to explore the house

25   with her. (*See Id.*)  The male friend did not return to the home with her.  (*See Id.*)  When Petitioner

26   entered her house, she claims she saw Ms. Pavageau dead in the corridor near the dining room. (*See

27   Id.*)  After that, Petitioner contended that her memories were vague and that she had a mental block.

28   (*See Id.*)  Petitioner claimed she acted in self-defense. (*See Id.*)

9

United States District Court

For the Northern District of California

1    The French authorities had several reasons for believing that Petitioner did not act in self-

2   defense, but instead willfully caused Ms. Pavageau's death. (*See Id.*)  First, Ms. Pavageau was hit at

3   least twenty times in a violent manner. (*See Id.*)  Further, the evidence supported a finding that Ms.

4   Pavageau was sitting in a dining room chair when she was hit. (*See Id.*)  Second, Petitioner lied

5   about the fact that she called 911. (*See Id.*)  She also made numerous telephone calls from the

6   afternoon of September 28, to September 29, 1993, which indicated panic to the French authorities.

7   (*See Id.*)  Third, the French authorities also considered Petitioner's personality and Federal Bureau

8   of Investigation reports that Petitioner was violent, irascible, untruthful and capable of physical

9   violence. (*See Id.* at 5.)  On August 8, 1997, the French investigation magistrate found that the facts

10  were sufficiently established for the case to be transferred to the general prosecutor. (*See Id.*)

11   The Court, relying on the documents in the record,  finds competent evidence of probable

12  cause exists to support a finding of extraditability.

13   **D.     Political Offense Exception**

14   The final inquiry in a collateral review of an extradition hearing is into whether the charge

15  falls within the political offense exception.  The Supreme Court has addressed the political offense

16  exception only once and established a two-prong test.  *Ornelas v. Ruiz*, 161 U.S. 502 (1896).

17  Commonly referred to as the "incidence test," Ornelas' two-prong test dictates that in order to be

18  considered a political offense, there must be "1) the occurrence of an uprising or other violent

19  political disturbance at the time of the charged offense, and 2) a charged offense that is 'incidental

20  to' 'in the course of,' or 'in furtherance of' the uprising.'" *Barapind v. Enomoto*, 360 F.3d 1061,

21  1074 (9th Cir. 2004) citing *Quinn v. Robinson*, 783 F.2d at 797.[2]

22  _____
    [2] In her Petition, Taylor raises the issue of future treatment in France and suggests the Court should

23  invoke the humanitarian exception.  As a result, the Court notes the following.  First, the rule of non-
    inquiry "usually requires the extradition court to refrain from undertaking inquiries into the justice

24  systems of foreign countries."  *Mainero v. Gregg*, 164 F.3d 1205 *citing Arnbjornsdottir-Mendler v.
    United States*, 721 F.2d 679, 683 (9th Cir. 1983).  Second, the Ninth Circuit has held the rule of non-

25  inquiry means "that it is the role of the Secretary of State, not the courts, to determine whether
    extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive

26  is likely to receive upon his return to the requesting state. *Prasoprat v. Benov*, 421 F.3d at 1016. citing
    *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir.2003) (stating that,

27  "judges generally 'refrain from examining the penal systems of requesting nations, leaving to the
    Secretary of State determinations of whether the defendant is likely to be treated humanely' "); see also

28  *Barapind v. Reno*, 225 F.3d 1100, 1105-06 (9th Cir. 2000) (stating that "[m]any courts, including ours,
    have adhered to the general rule that it is not the role of the courts, but rather the Secretary of State, to
    determine whether extradition should be denied on humanitarian grounds").

1    Neither party has raised the issue of whether the political offense exception applies, and the

2    Court finds no facts in the record to support such a finding.

3    **CONCLUSION**

4    After answering the four inquiries set forth by the Ninth Circuit, as set forth in *Prasoprat v.*

5    *Benov*, the Court **FINDS** Petitioner is not entitled to habeas relief.  For the foregoing reasons, the

6    Court **FINDS** the magistrate judge properly certified Petitioner for extradition in accordance with 18

7    U.S.C. § 3184.  Accordingly, the Court **DENIES** Taylor's petition for a writ of habeas corpus for all

8    claims.

9

10   **IT IS SO ORDERED.**

11   **Dated: March 31, 2007**
                                                    _____
12                                                  **MARTIN J. JENKINS**
                                                    **UNITED STATES DISTRICT JUDGE**
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California